Good morning. May it please the Court. In the Class Certification Order of the Under Review in this case, two former Genworth employees, who are also former participants in the Genworth Retirement Plan, were permitted to bind thousands of active employees and Genworth retirees and their retirement accounts to a far-fetched legal theory that has been rejected by the majority of courts to ever consider it. On top of that, this occurred to these thousands of retirees and employees without notice, much less an opportunity to opt out. This violated Article III of the Constitution and Rule 23, and to fully appreciate why that's so, it helps to examine the particular nature of this BlackRock target date fund in which they were invested. Always in Class Certification Review, we focus on the facts and the record in that case at hand. Here, what you had is so-called individual account plans. Each Genworth employee and retiree has his or her own account, and these accounts were in a so-called target date fund. These are all defined, this is a defined contribution plan. That's correct. A defined contribution plan with those individual accounts, and it's a known as a target date fund, which actually consists of many different sub-funds, or so-called vintages. Each vintage is targeted to a particular retirement age, and over time, the assets in that vintage change. They evolve to a more conservative position at the time of retirement. The result of that is important in two separate ways. First, what's in any particular vintage at any particular time varies from what's in other vintages that are targeting different retirement dates, and might be more aggressive because it's a distant retirement date, or more conservative because it's close. And then second and related, even within any particular vintage, how that vintage performed and whether somebody's account went up some or a lot, and by the way, there's no allegation here that accounts went down. That depends on when they entered and when they exited, because at what particular point along the lifeline of that fund. What is the nature of the injury you understand to be alleged? Well, the allegation by plaintiffs here, which by the way, is extraordinary, and I'm not aware of another court of appeals to consider a case like this. The allegation is that Genworth, even though it had one of the most highly regarded target date funds in the market, should have looked around and realized that at some cherry-picked period of time that plaintiffs found there were a couple of other funds out there that were doing even better, and they're alleging it was a fiduciary breach to stay with one of the most highly regarded target date funds in the market, which by the way, had inflows, increased investments throughout the class period. They're saying that that should have been dropped. Essentially, they're saying so low. For our purposes today, we don't need to resolve the question of whether it's a passive fund or an active fund where the American fund should be the right comparator to resolve the questions that are before us. That's correct, Judge Agee. Certainly, the plaintiffs themselves have said that you should disregard the American funds and their use of that later on summary judgment in ruling on class certification. And remember, on the class certification motion, they put forward four alternative funds just as they had in their complaint. The American funds was just one of those. They did not base their pursuit of class certification on the American funds. That came later. Now, the use of the American funds as a comparator is in the teeth of the decisions of every single court of appeal to consider this issue. May I ask a question about this sort of sequential argument? There seems to be, they seem to be arguing, or at least given them the most generous version, is that there's a breach of duty with respect to the BlackRock TDF. And that comes before, temporarily before, the question of what might be an appropriate comparator. The comparator might help us establish damages in some context. But the breach, this failure to monitor and the decision to retain, is actually like upstream of the comparators. Is that the right way to think about their alleged breach of duty? And I ask this, obviously, because of commonality, right, is where I'm interested. I think not entirely, Your Honor. I think their allegation, because most of the cases that were brought in the same legal theory were dismissed on the ground that the other funds identified in the complaint were not so-called reasonable benchmarks. They were not appropriate comparator funds. I get that. I get the other cases have done it, but maybe hypothesize that those maybe got it wrong, right? So the question I'm asking is, conceptually, why the breach of fiduciary duty, right? Imagine they all, they just went to sleep. They didn't look at anything. They could breach the fiduciary duty, even if it was a home run, right? Now, there might not be damages, right? But the breach seems to be upstream of the question of, like, what should they have done instead? Well, a couple of responses to that, Your Honor. First of all, part of their allegation is that the market itself was not being properly examined to determine whether these black ROC funds should be retained relative to what else was going on in the market. So this comparative exercise is their saying was part of the fiduciary responsibility that was breached. And then second, Judge Richardson, we would maintain that injury actually is necessary to the breach. No harm, no foul in this context is what we would argue. What's critical to understand here is not simply the huge variations in these individual accounts and how they performed in different ventures over time. It's, again, focusing on the allegations made in the class certification paper as much as 42% of the assets that were held in the black ROC TDF funds actually would have done better staying there, staying with the black ROC TDFs, rather than being invested instead in the most comparable comparators that the plaintiffs put forward in their complaint. And that's what we're talking about. I don't want to take you away from where you want to go, but my reading of your argument was the district court's fundamental error was this is not a B1 case, it's a B3 case. Am I reading your argument correctly? Your Honor, that is correct. That was one of many errors. There was an error regarding injury itself, which is what I'm addressing when I speak to the fact that roughly 40% of the class was not even shown to have been injured under plaintiff's own theories. This would go to the commonality, would it? As well as to Article III standing. That's exactly right, Judge Neumeier. Standing too, I'd argue. That's right. This Court very recently in the Freeman case said, look, you've got a large number of class members who are not injured. You don't have proper Article III standing for them. You don't have commonality. You can't proceed. Do you have a view on the Spearley case and the sort of fight between Judge Thapar and Judge Nalbandian about whether this is really Article III? I'm not sure whether it matters to you, but I sort of took your argument to take the strong Article III, the Nalbandian view, if you would. Does it matter if that's wrong and Thapar sort of has this right that really it's a Rule 23 question that we're sort of addressing, which may be a sort of a Justice Kavanaugh concurrence? Judge Richardson, I think within this circuit, this Court has looked to Article III and made an absence of Article III. It says there may raise Article III concerns, right? That part he does say. He doesn't say it's an actual Article III decision, right? And you could square that, I think, pretty easily with Thapar's idea that when we have this type of concern, we need to be particularly vigilant in deciding the Rule 23 parameters. But that's separate from sort of going full Nalbandian, that this is really an Article III power. As a matter of fact, the Transunion does that. In other words, standing can be Article III, but standing also can inform whether 23 has been complied with, and so that there is different standing or lack of standing to class members, then you don't satisfy the commonality and maybe- That's right. I think, Judge Neumeier, Judge Richardson, they lose either way. It's not a great moment to me whether this Court says because of the lack of standing, not that there's necessarily an Article III problem, there's a lack of commonality. Either way, they lose, and I think the Freeman decision recognizes that. Allig recognizes that. Stafford recognizes that. And the recent Freeman decision, too. So I think that this is squarely against the plaintiffs, simply on common injury, but there's more than that. Because that lack of common injury- I know we're asking you a lot of questions, but at the end of the day, what's, in your view, for you to prevail, what's the cleanest way to go? Is there an error on B1 versus B3? Is it standing? Is it commonality? Is it typicality? Because it seems like to me if there's an error, there's the same error in typicality there is in commonality, but that's just me. Your Honor, it's that lack of common injury, which is fatal as a matter of standing and also under Rule 23. We think that's essential for this Court to address rather than leaping to Rule 23B1. I don't think you get there without first going through 23A, and for that matter, considering Article 3. And the additional thing I want to say is that this lack of commonality is not just about- Are you an advocate of Justice Kavanaugh's opinion, solo opinion, in the LabCorp case as to commonality? He does focus on commonality there, but he also, and this comes back to what Judge Richardson is probing me on, he does so in the context where the Court took the case to address an Article 3 question. But remember, the lack of common injury is not the totality of the lack of commonality here. That lack of common injury stems from all the different vintages or sub funds that they were invested in, the different periods of time that they were in. This highly different and individualized experience is a larger part of what makes this case wrong. And so to come back to- That's a Wal-Mart problem, right? Exactly, Your Honor. Absolutely. And Wal-Mart, back to Rule 23, Wal-Mart said that common injury, in so many words, is an indispensable part of commonality, and Stafford recognized that as well. I believe that in Stafford, this Court said it's part of the Court's obligation to find differences that actually defeat common answers. That happens here. Suppose that I'm one of those employees who on plaintiff's far-fetched legal theory- let's leave that theory for a moment. Let's suppose that I could actually successfully show loss using other passive comparators, which are closer to the BlackRock TDFs. They're still different. They're still case law, saying they're not appropriate comparators. But let's suppose I could show injury using those. I don't want my case yoked to those American funds plans, which are active funds, which court after court after court have said are improper comparators. My point is even within the class, that lack of commonality, that lack of common investment experience results ultimately in conflict, in differences in terms of how they want to frame their legal arguments. And it's against the interests of plaintiffs, again, indulging their far-fetched legal theories for a moment, who could bring a case based on a more reasonably comparable passive fund to say, sorry, pal, we're going to yoke you to this really tendentious legal theory. We're going to use the American funds, even though that's failed in every single court of appeals to consider it. And respectfully, we think it's important for this court to touch on that problem, too. My client's been litigating this case, which has been brought on an unprecedented legal theory, for three years now. And we think it would be best if it did not go back for it to continue to proceed based on that erroneous legal theory. The district court seems to have a quasi-universal answer, whether it's on commonality or B-1 versus B-3, that there's an ERISA exception to the application of Rule 23. ERISA is different, explains a lot of the district court decision, Your Honor. And I know that you're interested in 23B-1 as well. And the key thing there is that, again, these are individual account plans. And we now know, after the Supreme Court's 2020 FOLE decision, that I can't sue on my individual or defined contribution account plan unless I've shown injury to my account. That is essential to proceed. And the plaintiffs have continued to say that all that matters is damage to the plan. After FOLE, that's just wrong. None of the plaintiffs in this class can proceed without injury to themselves. That shows that these are claims for money damages. These are people's retirements. These are individual accounts people look to on a monthly basis. What do I have for my retirement? And that's a money damages case. The Fifth Circuit said, the Sixth Circuit recognized that Rule 23B-1 is not appropriate for the case of this nature as well. I'll just wrap up by saying, unless there are further questions at this moment, I'll reserve the rest for rebuttal. Just to wrap up by saying, you know, the plaintiffs have suggested that this case proceeding is well within the mainstream of other classes certified. That's absolutely false. This case is unprecedented. There's not one like it that is post-toll, that doesn't involve excessive fees. It doesn't involve a defined benefit plan. It doesn't involve a single stock that tanked, like in the Da Feliz U.S. Airways case. Instead, it involves vintages, sub-funds. It's as if they invested in the market as a whole. On these facts and given the lack of injury to so much of the class, certification was legal error. Thank you. Thank you. All right, Mr. Miller. Thank you, Your Honors. May it please the Court, James Miller for the appellees. Respectfully, my friend, Mr. Scalia, does a great disservice to the hard work that Judge Payne did in the district court proceedings below. Well, he simply says he's wrong. I don't know if that's disrespect. That's our system. I believe he, I agree with you, Judge Niemeyer, but he says he's wrong, but he also is really arguing mostly the merits of the case without discussing the fact that summary judgment has been denied and that the true merits of the case relate, as Judge Richardson identified, to whether there was a breach at a certain point in time and then later how our damages evaluated. What do you, I can't, I will confess from all of the stuff I've read of yours, I can't figure what you think the actual breach is. Not the legal conclusion, right? You say failure to monitor, right? But tell me what you think they actually did. Yes, yes, Your Honor. Thank you for that question. One, they had an investment policy statement that said that they had to compare the performance of the BlackRock funds to two things. One, a custom benchmark, which is really a tracking mechanism, and second, to the S&P target date index. They never, they, the committee failed to meet for months and sometimes years at a time, and when they, when they met, they never evaluated the fact that the BlackRock funds, despite all of my friend's hyperbole about the performance of those funds, the BlackRock funds persistently underperformed the benchmark that was defined in the IPS. There's case law from many... Is your view that the fiduciary breach is independent of the four comparators that you have raised? Absolutely, Your Honor, and the four comparators are just placed in the complaint as a pleading matter to demonstrate a persistent level of underperformance. The other reality, and I just want to focus on this sort of 42% suggestion, that 42% suggestion that some of the class members would have been better off is related to an argument by defendants' expert as to one substitute investment. They say we should... Can I go back? I understand you want to talk about something else, but just to wrap this up. So the question I'm sort of trying to sort of tease out of you is like, to what extent you think the injury from these four funds is actually necessary for the breach piece? Your colleague on the other side suggested that you can't have a breach without an injury, and the only way you're pointing to an injury is by pointing at these four very diverse options. Is that a necessary part of your breach story? And if so, help me understand how that works? No, Your Honor. Under ERISA, the injury is not required for a breach. It's required to recover a loss. So if you look at the Parker-Hannifin case, the Bolli v. Universal Health case, you're talking about cases that say... You analyze breach separately. Breach in ERISA is divided into two components. One, questions of procedural prudence and substantive prudence. Here we have both. Here we have a committee that was regularly not meeting and was not evaluating the very substantive criteria that they themselves had defined as being the criteria by which the largest single investment in the plan should be judged. And I should note, Your Honors, that although it's a defined contribution plan, we're talking about a plan when Genworth made certain matching contributions, those funds were automatically deposited into vintages of those BlackRock funds. And I think importantly... What's the best defined contribution plan case that supports you? Well, the Third Circuit decision in Bolli v. Universal Health, it was addressing somewhat different issues related to standing, whether you needed to have a class member representing each vintage of the case. But it clearly recognized the legitimacy of these claims. The Sixth Circuit's case... Well, there can be legitimate claims, but that still goes back not just to the 23A question, but to the underlying 23B1 v. B3 question. So what I'm asking for is the most analogous defined contribution case that supports your view. Thank you, Judge Agee. I would point to Bolli v. Universal Health in the Third Circuit. I'm fond of that case because I argued it. And then also Parker... I'm sorry. I apologize. Johnson v. Parker Hannafin from the Sixth Circuit. Both cases that recognize that exactly these kinds of claims... Are these post-Thole cases? Yes, Your Honor. Yes. And I think Thole or Thole, and I confess, Your Honors, I'm not sure which way to pronounce it. I think it's important to note Thole v. U.S. Bank is a case that doesn't relate to defined contribution plans. It relates to a defined benefit plan. And in that case, the argument was the plaintiffs were arguing that certain actions had been taken with the defined benefit plan at U.S. Bank and questioning losses that could be suffered in the future. And the Supreme Court held in that case that there was not concrete injury and that there wasn't loss because there was no indication that those participants in a defined benefit plan would receive less than they were entitled to under the plan. So Thole or Thole, whichever way I should be pronouncing it, has very limited application to this case. I also just... Can I ask, when I go to 502 and I look at what is appropriate relief, and I'm really on the issue here, when we talk about appropriate relief, it naturally feels to me that we're describing money going into an individual's portion of the entire plan. It goes into their individual account. And so that feels like sort of individualized because if the court ordered as appropriate relief that the plan as a whole got unallocated dollars, that would seem to be wildly inappropriate to me. So can you help me understand why, when I think about what appropriate relief is, that the relief is not directed into individual accounts, which suggests to me fairly strongly that B-1 could not be a plausible solution for you. Right. Thank you. Thank you, Your Honor. I think that's an excellent question based on... Not that you need me to tell you that, but I apologize. I don't. Just give me an answer. Tell me why I'm wrong. That's what you really want to   So under the law of trusts, restoration of losses is a fundamentally equitable remedy. So if you look at Donovan versus... No doubt about that. But here, it goes to the individual account, not to the plan as a whole. The plan exists, and then they're effectively like sub-plans, like each individual account. So the relief is going to the individual account. Respectfully, Your Honor, I don't think that that's correct because if there was a recovery had here, the money would be returned to the plan, and then the fiduciaries would have to make a decision as to how to allocate those monies. They would be exercising their fiduciary duties. I can see to... But wouldn't that money be gauged on the injury to each individual account? Because the counts are different. They'll have different dates of termination dates, and they'll have different compositions. Yes, Your Honor. I think that most fiduciaries... So in order to determine the injury, you have to look at the injury of each account. And that would be different, wouldn't it? I apologize, Your Honor. I didn't mean to interrupt you.  I think that theoretically, what would happen in the event of judgment is obtained, as we know under TransUnion, only a damaged class member could make a claim. Most likely, the fiduciary isn't exercising their discretion. No, but the court couldn't do that. I don't understand how you think the court could do that. So take LaRue itself. You're saying that at the end of LaRue, the district court's judgment would not say, Mr. LaRue's account gets $100 or whatever it was. You're saying, no, no, no, the group as a whole, everybody, the plan gets the $100. And me as a court, I've got nothing to say about what the fiduciary does with that money. Like, that seems like a wild theory to me, that what the court's judgment power is not limited to when we're awarding appropriate relief, is not limited to giving it to the account that is indeed injured, but instead just hands it out. And then the fiduciary gets to assign it however they like. Yeah, and I wasn't suggesting that, Your Honor. I apologize. In LaRue, I think it's an important example. LaRue is a very exceptional case because the losses of LaRue were the only losses, so that they were coextensive with the plan's losses. So of course, if LaRue recovered, there would be either- No, but your theory is it has to go to the plan itself before, and then the fiduciary just gets to decide, based on their fiduciary duties, who gets that money. That's what you said happens here. Like, that can't happen here. The court is the one that awards damages to the injured parties, right? That is the individual accounts. They're not awarding damages to the plan as a whole, right? That's the very point of having to have an injury. But, Your Honor, under 502A2 of ERISA, the recovery has to occur to the plan. The losses have to be decided- To the plan. And the plan has an entirety, and it has subparts. This seems like, to me, the very point of LaRue is that there are subparts of the plan. And so money can go to the plan by virtue of going to a subpart of that plan. And that's the court's responsibility in issuing that judgment, not the fiduciary's responsibility to come up behind the court and clean up whatever the court does. Well, Your Honor, almost every court to address this issue after LaRue has said that LaRue does not change the fact that 502A2 calculates losses to the plans. I concede that- But it's the question of, is it the award of, and I'll stop and I'll let my colleagues go, but the award of appropriate relief to the plan, you're saying the money has to go to the plan as a whole, the court's judgment power, right? We got certain power. We are going to award money to the plan as a whole, right? Not to the individual part of that plan, that is the individual account. In your view, the fiduciary just gets to decide however he wants to allocate that money in accord with his fiduciary duties. And what I'm saying is that is antithetical to how I understand the Article III power that we have to award a remedy, appropriate relief under 502 to an injured party, that is the individual account, not the sort of broad plan as a whole to be distributed by the fiduciary. And Your Honor, I just respectfully disagree because under 502A2, it is quite clear that a plan of bringing a claim under that section has to be seeking losses on behalf of the plan. And so I don't disagree with you that either a fiduciary or court could direct that allocation. But isn't that just a – and now I will stop, I promise. Isn't that just a disagreement with LaRue? Like, you're just saying LaRue is wrong. Like, you can't give damages, you can't award appropriate relief to a subpart of the plan. And I understand, there were reasonable arguments. Indeed, our court accepted those arguments in the Fourth Circuit's decision in LaRue. But the Supreme Court says, no, no, no, no. You can award relief, appropriate relief to an individual account within the plan so long as it is a plan injury. Your Honor, I respectfully disagree with your reading of LaRue. I believe LaRue was correctly decided. And the reason that LaRue decided that an individual who had suffered losses in the plan had standing and could bring those claims was because the losses that were individual in that case, concededly, were co-extensive with the losses of the plan. And I believe that LaRue quite clearly says that under 50202, the relief being sought is being sought on behalf of the plan. I understand as a matter of mechanism that the allocation would then occur to Mr. LaRue. But I do think it's an important, separate step. And that's why the restoration of losses under the law of trust, and if we look at Donovan v. Bureworth, which is sort of the Second Circuit leading case in terms of how to calculate damages, which is regularly followed in this circuit, and I believe is referenced in Judge Agee in your decision in Peters v. Aetna. Which was a welfare benefit plan, which is not what we have here. Of course, Your Honor. But in Peters, I believe that the court followed the Donovan paradigm as to how losses are calculated and that losses were calculated on a plan-wide basis. And that was my, and actually I think in Peters, which was kind of quite an interesting case, the court found that the losses accrued on a plan-wide basis, even though when the, when you looked at the individual plaintiff, the individual plaintiff, although they had been charged that fee for I think it was chiropractic and physical therapy services, they might have otherwise have benefited because of the way they structured the plan, but that the losses existed. The Mars plan was out the money in that particular case, but that, and I don't want to repeat where Judge Richardson has been, but as I understand your argument, you tell me if I'm wrong, your view, which to me seems the same as what the district court said on any number of issues, 23B, commonality, typicality, under 502A, there is a per se rule that there is no individual claim so that any action brought under 502A would, by a defined contribution plan, would have to go under B1. There could not be a B3 case. I don't, I don't know that I, well, first of all, your honor, I think 502A1 and 502A3 provide for individual relief. 502A2 only provides for plan-wide relief. I don't know that I agree that certification can only occur under 23B1, but... Where's the money going to go? You win $3 million and the judgment goes $3 million, one lump sum. Where is that money going to go in this case? The money would go, the judgment... Not in this case, with the representative plaintiffs. The judgment would be entered, as the case is captioned, the judgment would be entered in favor of the plan and the class, and then the court would have to allocate... Well, the representative parties, how would the representative parties recover? Well, the representative parties would recover and the class would recover, presumably, by making claims against the corpus of the judgment, but the judgment would be entered in the name of the plan. I understand, I understand that, I mean, RISA provides for this derivative notion, which I understand, but that, after you pass that thing, I mean, it was written at a time when there were... Defined benefit plans were under the law. Defined benefit plans, which is clearly, you have to have a derivative notion there, but we have since defined contribution plans where the individual accounts perform differently and are injured differently, and each member has a different injury. So now, we somehow, and you've claimed it, damages to the representative, let's take the two representative parties, they each have damage in their injury in their account, you claim. Yes, Your Honor. So we award money, set aside the rest of the class, they get money, we're not going to make it payable to the plan, are we? We would make it payable to the individual representatives, wouldn't we? I believe, as a technical matter, Your Honor, under 50202, because the case was brought there, that the money would be payable to the plan, but then subject to a plan of allocation, as Judge Richardson indicated. All right, let's go your way. We make it, the check payable to the plan, but that money would then go to the accounts, based on the nature of the injury the account suffered. That would be, that would be the result in almost any... The point here is that that's the fiduciary, right? The fiduciary just gets to hand that money out, and they may have a suit, right? But the judicial power, in your view, is that it just goes to the plan, and then I'm done. And now the fiduciary has some responsibility. I mean, that means like, I'm just, I'm awarding, I, the court, is awarding money to a bunch of uninjured people, right? And then letting the fiduciary for those folks decide which one of those gets the money. I mean, that's, that's a wild system. You may be right. I understand that that's your argument, but that would be a wild system for the judicial power to be used in that way. And to then call that appropriate relief, as opposed to wildly inappropriate relief, it strikes me as really hard for you. Well, well, your honor, I think respectfully, I think that, you know, the way that Judge Payne carefully and limited the class, he did not identify the class as being all participants. He identified the class as being all investors in the BlackRock funds. So I think that would be obviously a substantial limiting parameter on the fiduciaries in terms of who they could allocate, because they could only allocate to class members. And I should note that I should... But it's their decision, right? Your point is the judicial power has still given the 5% that didn't invest in TDL, right? The judicial power has given them a benefit. And now the fiduciary might choose to allocate it to them or not. If they did allocate it to them, they would be subject to suit. I totally understand that. But that's their judgment, in your view. They get to decide. Well, I think that the judgment would be entered in favor of the plan and the class, given the dual representative nature. So that's, that's where the problem would be solved, your honor. Well, set aside the class, because class is at issue. Take your complaint, which is two representatives on behalf of the plan, in respect to their accounts. In other words, the only injury they're going to claim is the injury to their accounts through the derivative 502A, 2A plan. Well, no, your honor. Actually, I think that, that, that may be a very nice way to frame the question. In Cohn versus Kaufman... No, no. I want to know, just pragmatically, what's going to happen here. We have two plaintiffs who claim injury because constituent aspects of their fund were not monitored. And, and so under, under the, under the U.S. Supreme Court case in Tybill, if the case was not certified, then Mr. Traornek and Mr. Wright would have the right to bring a claim on behalf of the entire plan and independent of class certification. And this is exactly the issue that the Second Circuit addressed in Cohn versus Kaufman. The way that they said, the reason they said that certification under 23B2, I'm sorry, 23B1 is preferable is because there isn't a mechanism built into ERISA, as your honor indicated, post, with the creation of defined contribution plans and other vehicles that are more complicated. Why wouldn't we, sitting inside the class, why wouldn't we just enter judgment in favor of each plaintiff? There's two plaintiffs based on their injury. Well, to their, to be slightly more specific, to their portion of the trust, right? Not to them individually, right? But to their portion of the trust. We would enter judgment in favor of their portion of the trust. That is, their portion of the plan. But not the plan as a whole for the fiduciary to hand out willy-nilly, but the money has to be given to your client's portion of the plan. Your honors, if a claim had been brought under 23, under 502A1 or A3 for individual relief, that might be the case, but the claim that's been brought here is derivative. Well, that's what I'm trying to find out. I understand the derivative nature, and the argument basically is coming down on the B1, B3 issue, is whether the derivative nature is inherently a B1. And the, but the question I think that Judge Richardson and I are pursuing is we understand that. That's mechanically how it's set up. But in this particular case, the claim is that these two accounts, these two accounts have been injured because these two accounts contain certain targeted block grant funds that should not have been included. So we're going to measure their injury by what happened in their accounts, aren't we? Well, yes, you're going to measure their injury. And then we're going to pay it to the plan for distribution to them. Well, no, your honor, because they have the capacity under 502A2, and I think I may be over time. No, no, they're suing for just their injury through the plan. They're having the plan do the suit. But the nature of the recovery is, the only proof you can put on is what was put in their plan, right? Well, no, your honor, because under section 409 of ERISA, you are entitled to recover the losses of the plan, which would include all of the participants. It's an inherently derivative action. So we don't believe that the lim, the. Why'd you file a class action then? As Cohn v. Kaufman recognizes that one of the best ways to handle allocation issues and issues of manageability in light of the derivative nature of 502A2 claims. All right, so now let's go, let's follow you out. These two are not only filing for their own, but they're filing for every other person who has BlackRock targeted funds. Yes, your honor. We have to go to each one of those person's accounts to see how they were hurt, because there's a selection process. They could pick, one of these plaintiffs picked three years, targeted years. The other picked one. So we're going to have to compute that, and the nature of their injury is different, right? In each account. Yes, and we have calculated that, your honor. Well, I understand. I don't care about how, I want to know how it's going to work. You're suing on behalf of everybody who has the BlackRock targeted funds. So now, basically, we're going to have to decide, with respect to every one of those persons, how they were injured, whether the particular targeted funds were deficient funds, right? Because if they weren't deficient funds, there's no injury. Well, your honor, as I know that I'm over time, but let me answer your question. Yeah, I need to have the answer, yeah. As the defendant's own expert, Mr. Wormers, admits, this is a single decision to add these funds made on a plan-wide basis. And so it's either a breach or not, as to all class members. It's not something that- The class members, don't they have a right to select what goes in their plan? Yes, they do. From a menu? Yes, they do, your honor. But the fiduciary act that we're describing here is the choice of the menu. And Mr. Wormers, in his report, says the choice of the target date series is a single choice. And so, and that is why- You're alleging that every one of those funds, every targeted date, was a deficient over a breach fiduciary date? Yes, your honor. We showed at summary judgment that every single one of those vintages underperformed its own benchmark in the IPS on a consistent basis. To go back to Judge Richardson's question. But the reason that 23B1A and B are so appropriate here is because the question at issue is, was there a breach? That question is common to all class members, because only one investment can be put in there on the menu. It's common, but at bottom, we're talking about real money. And the real money is money that is held by these beneficiaries. And each beneficiary has been harmed in a different way. And the money is ultimately going to get to these people. And so you're saying, we're going to have a class that is going to decide this issue for everybody. And we're not going to let any class member opt out or even receive notice of the litigation. We're going to mandate that every one of these people has been hurt because they have some of these BlackRock plans. And all of them in different configurations, different years, every ten years or whatever they are in there. Does that work? Well, yes, your honor. One, I should say that we regularly provide notice in 23B1 cases and there was no request here. So I just wanted to put that aside. No, but it's basically somebody may want to opt out and said, my particular plans did very well. As a matter of fact, my particular plans defeated the other plans that are in the thing and I like it. I don't want to participate. What about that beneficiary? But your honor, the relief that's being sought here is both the restoration of the losses to the plan, as well as the declaration that there is a breach. And if that fund is eliminated from the menu. Is there a breach without injury? There is a breach of fiduciary duty without injury to go back to Judge Richardson's question. But whether or not there's a loss to the plan is a separate question. And losses are calculated on an aggregate basis. This is recognized in Tibble versus Edison. Every U.S. Supreme Court case that's been decided under ERISA in the last half dozen years has been a 502A2 class action. So it's not an outlandish action that we're pursuing respectfully. And I think that it is important to focus on the fact that the single decision to add the target date suite to the menu is the claimed breach. If from both of 23B1A and 23B1B perspective, you have profound issues if you have different decisions made as to whether or not that's a breach or not. I think we've gone over quite a bit here, but you've been helpful. Thank you for your indulgence, your honors. Sure thing. All right, Mr. Scalia. If I could, I'd like to come back to this issue that has taken so much of the panel's time and first address a threshold question or two. One, I don't think we heard from plaintiff's counsel at any point on this very important question of the absence of a common injury. Setting aside theories of liability, what have you. Well, I didn't get around to asking it because it didn't seem relevant with respect to his answers. I mean, but it seems to me every beneficiary suffers a different injury. I mean, it's dependent on the composition and nature of what he selected or what was put in by default. Well, that's right. And it's not enough to say that there's been an injury to the plan as a whole. And Fole answers that question for us. There has to be individualized account-based injury. If I don't have that, Fole says, I'm out of court. What do I do if I just say that the only plan that's left here, as is hypothetical, I acknowledge, is the American funds? And in that world, we could then say, and I understand you think it's not a proper comparator, but I'm on the Rule 23 question, not the 12B6 question. Then we would have an injury. It's not the same, but we have an injury to every class member then, right? I don't know that you actually have one for every class member. I think what you have is every vintage during this cherry-pick period of time. Because somebody could have bought it at a particular time. You still have that problem. I want to come to Judge Agee's question, a question that I always like. What's your best case? What's your best case? You were told the Boley case. You were told the Johnson case. I don't know what that is. I don't think it was cited. You were told Boley, Third Circuit case, that Mr. Miller handled. That is one of the other kinds of cases that I mentioned, an excessive fees case where allegedly all accounts were charged excessive fees, so all accounts had the same problem. Here's what the Third Circuit said. It said, the nature of these claims makes intra-class conflicts unlikely. It is difficult to imagine class members who have benefited from or are content to pay pointless fees. That's a completely different issue than individual account performance, such as in a case like this. When that's his best case, he's got no useful precedence. Let me ask you as a factual matter. Is there a fund apart from the individual beneficiary's accounts? I don't believe it's a practical matter that it's kept anywhere. It's held in trust for individual accounts, but I don't think there's actually a corpus. I think it's bank accounts alone. Are there funds that are not allocated to any particular account? I don't believe there are funds that are kept somewhere separately, but I'd like to conclude with just some observations on this, because with all respect to Mr. Miller, who's very effective in this area of the law, if I'm a Genworth plan participant, I want somebody who's here to represent my account. I don't want somebody who tells me, oh, sorry, Mr. Scalia. Yeah, I'm here for the plan. I'm here to maximize for the plan. At page four of his brief, Mr. Miller says, all class members share the same interest in maximizing return for the plan. If he told me that as his client, I'd say, I'm sorry. I'm sorry. I'm here for my personal retirement account. I want what Mr. LaRue wanted, and I want a lawyer who's going to get that for me. It's as if Mr. Miller is saying, like Brandeis, I'm the lawyer for the situation. I want a lawyer for my account. And what LaRue tells you is that you have the right to do that, and Fall tells you, you must do that. There was a day after Russell where the thought was, there must be injury to the plan, and maybe that's enough. And maybe individual account injury doesn't count. LaRue said, no, it does. It's an injury to the plan affecting the account. And then finally we have Thole. Thole says, you have to have injury to the individual account. And the plaintiffs have never had an answer to Thole. You barely heard it in their brief. They mentioned it once in a footnote. Even though we cited it eight times, that case has changed how these cases can be litigated. One of the fundamental points of distinction between so many cases that Mr. Miller has relied upon and what this court should properly do here. Let me ask you, the fact that the individuals have a choice with respect to what's contained in their accounts play any role in this discussion? In other words, each beneficiary gets to make a choice from the menu and gets to, I guess, even apportion where his money goes. Does that have any play in the class action issue? I think, Your Honor, there are certain defenses that can be made based on that ability that plaintiffs have. What's relevant here is that they have those accounts and that they can make decisions about them and pursue those accounts' interests for themselves. But we're not interposing a defense based on the choice they exercise. Because my concern is what you put on the menu. I mean, that would be the argument. You're not making your colleague's argument for them. But what they put on the menu might well sort of be an error or a breach of beneficiary duty in some other context. Yeah. And what they chose here was one of the most highly rated funds. I could just conclude with respect to the Bolia case, again, which Mr. Miller handled. That case involved a firm that had an actively managed fund. And it got sued for having an actively managed fund because of those excessive fees that I mentioned. Partly because of litigation like that. Clients like Genworth have said, I'm going to go to a passively managed fund. I just don't want to deal with that litigation risk. What happens next? One of the world's highest rated passively managed funds is adopted by Genworth and 10 other companies. And they all get sued for what? For not having an actively managed fund. We can't manage retirement accounts in this way. Can I ask a follow up to the question that I asked your colleague? Is how we would manage in this context to order relief? So forget the class action. Just imagine we've got these two plaintiffs. And they prevailed on this theory. Just accept it as a hypothetical. I know it's hard, but just accept it. What is the relief that would ultimately be ordered? And I'm trying to figure out, what is the relative role of the judiciary and the relative role of the fiduciary? Do you have a view as to whether it is the judiciary that would award the appropriate relief to their two individual accounts? Or whether that relief from the judiciary would go to the plan as a whole and the fiduciary would then allocate it to the accounts? Do you have a view about which way that should work and why? Your Honor, it's an interesting question. I looked into it in preparing for this argument. I couldn't get a clear answer. And I think part of the reason is because of the settlement pressure a case like this exerts, they end up getting settled. I think the bottom line is the same, regardless how you get there. It has to be money into individual accounts because that's what their individual right is in their account. I doubt that would be written into the terms of a court order. You know, John Doe gets X. But I do think there would need to be an allocation process agreed upon by the parties and presumably approved by the court, whereby somebody responsibly ensured that the individual people got what was their right, rather than there just being some sort of brooding relief to the plan as a whole, which is not how the individual class members would want it to operate. All right. Thank you. Thank you. All right. We'll adjourn court for the day and come down and greet counsel. Dishonorable Court stands adjourned until tomorrow morning. God save the United States and Dishonorable Court.
judges: Paul V. Niemeyer, G. Steven Agee, Julius N. Richardson